```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| CANDACE L. WARREN, | : | CIVIL ACTION |
| | : | NO. 17-4782 |
|     Plaintiff, | : | |
| | : | |
|  v. | : | |
| | : | |
| MASTERY CHARTER SCHOOLS, | : | |
| | : | |
|     Defendant. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                                 May 9, 2018

      This is an employment case for race and age discrimination. The Defendant has filed a motion to dismiss, or in the alternative, for summary judgment, based on a release of all employment claims that the Plaintiff signed in exchange for severance benefits. Ultimately, with the benefit of briefing and oral argument, the Court will construe the motion as a motion for summary judgment, and grant it.

I.    **FACTUAL BACKGROUND**[1]

      Plaintiff Candace Warren ("Warren") is an African-American woman over forty years of age with a master's degree.

---

[1] The Court views the facts in the light most favorable to the Plaintiff, the nonmoving party.

See Am. Compl. ¶¶ 7, 9, ECF No. 4. Warren was employed by Defendant, Mastery Charter Schools ("Mastery") from 2011 to 2016 as a social worker. Id. ¶¶ 10-13. Each year, Warren would get a one-year employment contract, which would then be renewed for the next year. See id. ¶ 30. During most of her tenure at Mastery, Warren received positive feedback about her job performance. Id. ¶¶ 24-25. She also received raises and bonuses based on her employee evaluation ratings. Id. ¶ 25. However, Mastery's Regional Director, Debbie Durso, decided not to renew Warren's contract at the end of the 2016 school year, based on allegations of poor performance and communications issues. Id. ¶ 30. Accordingly, in late April 2016, Mastery informed Warren that it did not intend to renew her contract. See id. ¶ 30.

Then, on June 23, 2016, the day before Warren's last day of employment with Mastery, Mastery sent Warren a proposed severance agreement containing a release of employment claims (hereinafter, "Agreement and Release") for her review.[2] Decl. of Theresa Velykis, ¶ 6, Def's Mot. Ex. 2, ECF No. 7-2. The Agreement and Release explained that, regardless of whether Warren signed it, she would receive every benefit that she was already entitled to, including accrued salary and pay for

---

[2] The Amended Complaint does not contain or refer to the Agreement and Release. See generally Am. Compl. However, the Agreement and Release is attached as an exhibit to Mastery's motion, ECF No. 7 Ex. 1, and Warren does the dispute the authenticity thereof. See Pl's Br., ECF No. 8.

See Am. Compl. ¶¶ 7, 9, ECF No. 4. Warren was employed by Defendant, Mastery Charter Schools ("Mastery") from 2011 to 2016 as a social worker. Id. ¶¶ 10-13. Each year, Warren would get a one-year employment contract, which would then be renewed for the next year. See id. ¶ 30. During most of her tenure at Mastery, Warren received positive feedback about her job performance. Id. ¶¶ 24-25. She also received raises and bonuses based on her employee evaluation ratings. Id. ¶ 25. However, Mastery's Regional Director, Debbie Durso, decided not to renew Warren's contract at the end of the 2016 school year, based on allegations of poor performance and communications issues. Id. ¶ 30. Accordingly, in late April 2016, Mastery informed Warren that it did not intend to renew her contract. See id. ¶ 30.

Then, on June 23, 2016, the day before Warren's last day of employment with Mastery, Mastery sent Warren a proposed severance agreement containing a release of employment claims (hereinafter, "Agreement and Release") for her review.[2] Decl. of Theresa Velykis, ¶ 6, Def's Mot. Ex. 2, ECF No. 7-2. The Agreement and Release explained that, regardless of whether Warren signed it, she would receive every benefit that she was already entitled to, including accrued salary and pay for

---

[2] The Amended Complaint does not contain or refer to the Agreement and Release. See generally Am. Compl. However, the Agreement and Release is attached as an exhibit to Mastery's motion, ECF No. 7 Ex. 1, and Warren does the dispute the authenticity thereof. See Pl's Br., ECF No. 8.

vacation time. Def's Mot. Ex. 1, ECF No. 7-1. It further provided that, if she did agree and sign the Agreement and Release, she would get severance benefits that she was not otherwise entitled to – including four additional weeks' worth of pay. Id. ¶¶ 2.1 - 2.3. In exchange for these severance benefits, Warren would waive any and all employment-related claims against Mastery. Id. ¶¶ 5.1 - 5.4.

Warren had twenty-one days to consider this offer. See id. ¶ 7. Also, if she agreed and signed the Agreement and Release, she could revoke her agreement within seven days. Id. The Agreement and Release contained, in three places, the suggestion that Warren consult with an attorney before she agreed and signed. See id. For example, it contained the following paragraph, in capitalized and bolded text:

> **PLEASE READ THIS AGREEMENT VERY CAREFULLY. THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS, INCLUDING THOSE ALLEGING EMPLOYMENT DISCRIMINATION, AND BARS FUTURE LEGAL ACTION AGAINST EMPLOYER BY EMPLOYEE FOR CLAIMS ARISING PRIOR TO THE EXECUTION OF THIS AGREEMENT. YOU SHOULD CONSULT WITH AN ATTORNEY BEFORE SIGNING THE AGREEMENT.**

Id. at 7 (emphasis in original). Additionally, the Agreement and Release included language stating that, by signing, Warren was acknowledging that she was doing so in a knowing and voluntary manner. Id. ¶ 8.

As Warren's relationship with Mastery deteriorated, she experienced significant stress. Warren Aff. ¶ 15, ECF No. 8-

3. This stress caused Warren to suffer from rashes, hair loss, depression, and anxiety. Pl's Br. at 6, 8, ECF No. 8. When Mastery offered her the choice of signing the Agreement and Release in exchange for severance benefits, Warren worried that if she did not sign, Mastery would use its influence to impair her employment opportunities with future potential employers. Warren Aff. ¶¶ 18-20. With this worry in mind, Warren thought about whether she wished to sign the Agreement and Release for the full twenty-one day consideration period, finally signing it on the twenty-first day. Pl's Br. at 9. Warren explains that, because she was under stress and was worried that Mastery would interfere with her future employment prospects, she felt that she had "no choice" but to sign the Agreement and Release. Id.[3]

## II. PROCEDURAL HISTORY

Warren filed this action against Mastery on October 25, 2017, ECF No. 1, and then filed an Amended Complaint on February 1, 2018, ECF No. 4. The Amended Complaint contains claims for employment discrimination based on age and race, in

---

[3] During oral argument, counsel for Warren referenced events taking place after the parties entered into the Agreement and Release. See Transcript of Oral Argument on May 1, 2018 ("Transcript") at 9:13-25, 10:1-3; 25:23-25, 26:1-5. Counsel for Mastery agreed that the Agreement and Release does not apply to, and therefore would not bar, any claims that Warren might have based on events that occurred after the effective date thereof. See id. at 32:14-25, 33:1-8.

4

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 et seq. See id. ¶¶ 32-62.

Mastery has filed a motion to dismiss Warren's claims, or, in the alternative, for summary judgment, based on the Agreement and Release. ECF No. 7. Warren has filed a response in opposition thereto. ECF No. 8.[4] Accordingly, Mastery's motion is ripe for disposition.

As Warren correctly points out, Mastery's motion should be construed as a motion for summary judgment, because it is based on the Agreement and Release – a matter outside the pleadings. Warren does, however, agree that the Court may properly rule on Mastery's motion as a motion for summary judgment.

**III. LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere

---

[4] Mastery also filed a motion for leave to file a reply, ECF No. 9, to which Warren filed a response in opposition, ECF No. 12.

existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

Where, as in this case, a purported motion to dismiss invites consideration of matters outside of the pleadings, the Court may convert the motion into a motion for summary judgment. See Kulwicki v. Dawson, 969 F.2d 1454, 1463 n. 11 (3d Cir. 1992) ("[T]he decision to convert a motion to dismiss to a motion for

summary judgment is generally committed to the district court's discretion under Fed. R. Civ. P. 56."). Summary judgment is appropriate at this stage because the parties had adequate notice that the motion was converted, as well as an adequate opportunity to present sufficient evidentiary materials for the Court to dispose of the motion as a matter of law. See Rose v. Bartle, 871 F.2d 331, 341-42 (3d Cir. 1989).

**IV. DISCUSSION**

Mastery's position is that the Agreement and Release signed by Warren in exchange for a severance package bars her claims as a matter of law. Warren concedes that she signed the Agreement and Release, but contends that the release therein is invalid.

A. <u>Release of Employment Claims</u>

An employee may release employment discrimination claims against an employer so long as the release is made "knowingly and willfully." Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1998) (quotation omitted); see also Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n. 15 (1974). Whether such a release is knowing and willful is determined by a totality of the circumstances test. Coventry, 856 F.2d at 522-23.

7

Under this test, the following factors are considered: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his or her rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received the benefit of counsel; (6) whether there was an opportunity for negotiation of the terms; and (7) whether the consideration given in exchange for the release and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law. Id.

Additionally, where a release purports to waive claims under the ADEA, the provisions of the Older Worker Benefit Protection Act ("OWBPA") also apply. Pursuant to the OWBPA, an individual cannot waive any ADEA right or claim unless the waiver is "knowing and voluntary." 29 U.S.C. § 626(f)(1). To be knowing and voluntary under the OWBPA, a release must satisfy the statutory requirements set forth in the statute. Id. at § 626(f)(1)(A)-(H).[5] In this case, only one of those requirements

---

[5] Because "the OWBPA was enacted to 'establish[ ] a floor, not a ceiling,'" a release that satisfies the statutory requirements of the OWBPA is only valid if it was entered into knowingly and willfully under the totality of the circumstances test set forth in Coventry. See Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 295 n.8 (3d Cir. 2003) (quoting Long v.

is in dispute: the requirement that a release be "written in a manner calculated to be understood by such individual, or by the average individual eligible to participate."[6] Id.

Here, Warren asserts that Mastery has failed to establish that the release provision in the Agreement and Release is written in a manner calculated to be understood. Therefore, in Warren's view, it is not "knowing or voluntary" under the OWBPA, and thus does not bar to her ADEA claims. Additionally, Warren argues that the release provision is

---

Sears Roebuck & Co., 105 F.3d 1529 (3d Cir. 1997)). See also Coventry, 856 F.2d at 522 (setting forth the totality of the circumstances test for "knowingly and willfully"). For that reason, some courts, in analyzing the validity of releases under the OWBPA, use the OWBPA terms "knowing and voluntary" when applying the "knowing and willful" standard from Coventry. E.g. Wastak, 342 F. 3d at 294 (analyzing whether release was signed "knowingly or involuntarily" under the OWBPA).

[6] A waiver by an individual of ADEA claims must: be (1) "written in a manner calculated to be understood by such individual, or by the average individual eligible to participate"; (2) "refer [ ] to rights or claims" arising under the ADEA; (3) "not waive rights or claims that may arise" in the future; (4) be "in exchange for consideration in addition to anything of value to which the individual already is entitled"; (5) advise the individual "in writing to consult with an attorney"; (6) provide at least twenty-one days to consider the agreement, or forty-five days if offered pursuant to a reduction in force; (7) provide a seven-day period to revoke; and (8) if proposed to the individual in connection with a reduction in force or exit incentive program, inform the individual as to the eligibility as to class, unit, and time limits and the job titles and ages of all individuals eligible or selected for the program and job titles and ages of those not selected for the program. 29 U.S.C. § 626(f)(1)(A)-(H). The party asserting the validity of the waiver bears the burden of demonstrating that the eight statutory requirements are met. 29 U.S.C. § 626(f)(3).

invalid, as to all of her claims, because she did not enter into the Agreement and Release "knowingly and willfully" under Coventry because of the stress that she was under when she signed.

The Court will first address Warren's argument that her decision to enter into the Agreement and Release was not knowing and willful. Subsequently, the Court will address her argument that it is not written in a manner calculated to be understood.

B. Knowing and Willful

As noted above, Warren argues that her decision to enter into the Agreement and Release was not knowing and willful because of the stress that she was under at the time that she signed it. This stress included her worry that if she did not sign, Mastery would use its influence to impair her employment opportunities with future potential employers.

However, the fact that an employee was experiencing stress and worry at the time she signed a release of employment claims does not mean that her signature was not knowing and willful. See, e.g., Cuchara v. Gai-Tronics Corp., 129 F. App'x 728 (3d Cir. 2005) (citing Coventry, 856 F.2d at 522-23); Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 294-95 (3d Cir. 2003). For example, in Cuchara, the Third Circuit affirmed the district court's holding that the plaintiff knowingly and

willfully signed a release of employment claims, despite suffering from Guillian Barre Syndrome – a serious medical condition. 129 F. App'x 729.

The Cuchara plaintiff's illness made a normal work schedule difficult, and he sought various accommodations. Id. Several months later he was fired. Id. Upon termination he was offered a severance package that included some additional salary, and medical and dental benefits; in exchange for the package he was required to sign a general release of claims. Id. at 730. The plaintiff accepted the package and then brought suit under Title VII, the ADA, the PHRA, and the Employee Retirement Income Security Act ("ERISA"). Id. His employer filed a motion to dismiss, citing the release. The district court applied the Coventry factors in reviewing the validity of the release through the motion to dismiss, and ruled in favor of the employer. Cuchara v. Gai-Tronics Corp., No. 03-6577, 2004 WL 1438186 at *5 (E.D. Pa. Apr. 7, 2004) (citing Town of Newton v. Rumery, 480 U.S. 386 (1987) ("It may be appropriate to undertake this inquiry on a motion to dismiss"), aff'd, 129 F. App'x 728 (3d Cir. 2005).

On appeal, the Third Circuit examined the Coventry factors and specifically found: 1) the language of the release was clear and specific; 2) while plaintiff was not an attorney, there was "no evidence that he was unable to comprehend the

11

language of the [r]elease"; 3) the twenty-one days during which he was given to sign the release provided sufficient time for deliberation; and 4) plaintiff was repeatedly advised that he should obtain counsel, had the opportunity to obtain counsel, and chose not to do so. Cuchara, 129 F. App'x at 731. Based on those factors alone, the Third Circuit found that the "totality of the circumstances demonstrate that [the plaintiff] knowingly and willfully waived his claims by signing the [r]elease." Id.

In a similar case, Wastak, the Third Circuit held that an employee's claim that he was suffering from "psychological trauma," a "fragile mental state," and dire financial circumstances at the time he executed a release of employment claims did not "create a genuine issue of material fact with regard to any lack of understanding or voluntariness on his part in signing the [r]elease." Wastak, 342 F.3d at 294-95. The Wastak plaintiff signed a release of employment claims after his termination, in exchange for severance benefits. Id. at 284-85. He later filed suit against his former employer, claiming violations of the ADEA and OWBRA, as well as the PHRA. Id. at 285. The plaintiff admitted in his deposition that he understood the release, but claimed that after he was terminated, but before he signed the release, he faced the prospect of serious financial pressures; conditions that ultimately caused him to suffer severe depression and anxiety, for which he sought

psychological treatment and medication. Id. at 294-95. When the employer moved for summary judgment, the plaintiff argued that his mental and emotional troubles caused his acceptance of the release to not be knowing and willful. Id.

In affirming the district court's grant of summary judgment for the employer, the Third Circuit observed that while the plaintiff's claim that "he signed the waiver involuntarily given his financial circumstances and fragile mental state . . . should usually be decided by a jury," the plaintiff had "not come forth with sufficient evidence to create a genuine issue of material fact with regard to any lack of understanding or voluntariness on his part in signing the [r]elease." Id. at 295. The Third Circuit further noted that "the existence of financial pressure to sign a waiver is insufficient to establish that it was executed involuntarily." Id.

Warren, like the plaintiff in Cuchara, "is an educated professional and there is no evidence that [s]he was unable to comprehend the language of the [Agreement and] Release or the implication of waiving [her] claims." 129 F. App'x at 731. Additionally, Warren thought about whether she wished to sign the Agreement and Release for the full twenty-one day consideration period, finally signing it on the twenty-first day. The fact that Warren took her time to contemplate whether or not she wanted to enter into the Agreement and Release

13

indicates that she was able to understand it and the "implication of waiving [her] claims." Id.; see also Batjer v. AHS Hosp. Corp., 594 F. App'x 73, 75 (3d Cir. 2014) ("Given the circumstances surrounding [the plaintiff's] adoption of the release — including the passage of time . . . it is evident that her waiver was knowing and voluntary.").

As the case law makes clear, undergoing stress does not necessarily render an employee's decision to enter into a release of employment claims not knowing and willful. Wastak, 342 F.3d at 295 (noting that "the law is clear that the existence of financial pressure to sign a waiver is insufficient to establish that it was executed involuntarily") (citing cases). Moreover, Warren "has not come forth with sufficient evidence to create a genuine issue of material fact with regard to any lack of understanding or voluntariness on [her] part in signing the [Agreement and] Release." See id. at 295. In fact, Warren has not pointed to any circumstances, other than those forming the basis of her released claims, to support the contention that her decision to enter into the Agreement and Release was not knowing and willful.[7] Accordingly, the Court

---

[7] During oral argument, counsel for Warren attempted to distinguish her client from the plaintiffs in Cuchara and other cases, on the basis that Warren was not suffering from a serious physical ailment at the time she decided to enter into the Agreement and Release. However, if that distinction is correct, it undermines Warren's position. If Warren was not suffering

14

finds that Warren's decision to enter into the Agreement and Release was knowing and willful.

B. <u>Manner Calculated to be Understood</u>

Warren's second challenge to the Release focuses on the OWBPA requirement that a release be written in a manner calculated to be understood, which is set forth in 29 U.S.C. § 626(f)(1)(A). This section provides, in relevant part, that a waiver may not be considered knowing and voluntary unless it "is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate." Id. The regulations go on to clarify as follows:

> Waiver agreements must be drafted in plain language geared to the level of understanding of the individual party to the agreement or individuals eligible to participate. Employers should take into account such factors as the level of comprehension and education of typical participants. Consideration of these factors usually will require the limitation or elimination of technical jargon and of long, complex sentences.

29 C.F.R. § 1625.22(b)(3).

To determine whether a purported release is written in a manner calculated to be understood under the OWBPA, the Third Circuit considers the totality of the circumstances. <u>Wastak</u>, 342 F.3d at 294 n.8.

---

from a serious physical ailment, she would have been more – and not less – able to knowingly and willfully enter into a release than if she were.

15

The release at issue here is contained within the seven-page Agreement and Release. Specifically, paragraph 5.1 of that document states:

> In consideration of the payments by Employer to you set forth in this Agreement, you, for yourself, your heirs, executors, administrator, successors and assigns (collectively called the "Releasors") hereby irrevocably and unconditionally release and forever discharge Employer/Releasee and each of its and their successors, predecessors, affiliates, subsidiaries, officers, directors, agents, employees, shareholders, heirs, executors, administrators, representatives, or assigns, and all persons acting by, through, or in concert with any of them (collectively called the "Released Parties") from any and all claims, promises, contracts, causes of action, debts, suits of discrimination, claims for wages, pay, attorney's fees or benefits, claims for damages (including, but not limited to, damages for personal injury, emotional distress or harm, compensatory damages, punitive damages, liquidated damages and exemplary damages), or other forms of relief (legal, equitable, and declaratory), asserted or unasserted, of whatever kind or nature, in law or equity, by statute or otherwise, whether now known or unknown, vested or contingent, suspected or unsuspected, and whether or not concealed or hidden, which have existed or may have existed, or which do exist (all of which are collectively referred to as the "Claims") of any kind from the beginning of time to the effective date of this Agreement which you now have or may have against the Released Parties, including without limitation all Claims (including cross-claims) arising out of or relating in any way to your employment with Employer of the termination of that employment. Such released Claims include, without in any way limiting the generality of the foregoing language, any and all claims of employment discrimination under the United States Constitution, the Constitution of the Commonwealth of Pennsylvania, the Age Discrimination in Employment Act of 1967, as amended, including the Older Workers Benefit Protection Act of 1990 (ADEA) (29 U.S.C. § 621, et seq.); the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101, et seq.); Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000, et seq.); the Civil Rights Act of 1991; the Employment Retirement Income Security Act (ERISA); the Equal Pay Act (29 U.S.C. §

201, et seq.); the Family and Medical Leave Act (29 U.S.C. § 2601, et seq.); the Rehabilitation Act of 1973; the Pennsylvania Charter School Law, Public School Code, the federal and Commonwealth Wage and Hour Laws, the Pennsylvania Human Relations Act and any other local, state, or federal law, order, regulation or ordinance (including but not limited to those relating to labor, employment, benefits or wages) and any and all claims under the foregoing laws, and any and all amendments to any of those laws, orders, regulations or ordinances. In addition, such released Claims include any and all claims relating to any Employee Handbook, to any whistleblower or retaliation Claims; to any claims of breach of any express or implied contract, and any claims of wrongful termination or any civil rights, labor, or tort claims, including claims for attorney's fees, punitive damages, or costs of suit, whether based on common law, or otherwise.

Def's Mot. Ex. 1 at ¶ 5.1, ECF No. 7-1.

Warren's position is that this language is replete with lengthy and complex run-on sentences, comprised of confusing legal jargon. Pl's Br. at 12, ECF No. 8-2. For this reason, in Warren's view, it is not written in a manner calculated to be understood.[8] In support of this contention,

---

[8] At oral argument, Warren's counsel raised three additional arguments. First, she argued that, because the Agreement and Release did not provide a list of the claims being waived in bullet point form, it was not written in a manner calculated to be understood. See Transcript at 21:6-16. However, there is no such requirement under the OWBPA. Further, such a requirement would run contrary to the totality of the circumstances test. Second, Warren's counsel, quoting Coventry, stated that "[c]areful evaluation of the release form itself, and of the complete circumstances in which it was executed, is necessary to assure that the goals of the ADEA are preserved." Id. at 41:5-9 (quoting 856 F.2d at 523). The Court notes that it has carefully evaluated the totality of the circumstances in this case. Third, when the Court asked Warren's counsel to point to facts or circumstances supporting her contention that the

17

Warren pointed, both in her brief and at oral argument, to the first sentence of paragraph 5.1 of the Agreement and Release. See id. at 12; Transcript at 14:22, 15:1-13.

Even if Warren's characterization of that sentence is correct, "the mere fact that the [Agreement and] Release was long and contained legalese does not, in and of itself, render it incomprehensible." Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 388-89 (E.D. Pa. 2014) (holding that a lengthy OWBPA release containing legal jargon was understandable and therefore valid) (citing Ridinger v. Dow Jones & Co., Inc., 717 F. Supp. 2d 369, 374 (S.D.N.Y. 2010) ("While the Agreement is nevertheless scarcely a model of 'plain English' draftsmanship, it adequately conveys the limitations [ ] accepted in exchange for enhanced severance pay. There also is no indication that any of the [terms] were couched in terms too complicated for [plaintiff] to understand."), aff'd, 651 F.3d 309 (2d Cir. 2011)). "Certainly, almost every release, waiver, disclaimer, etc. contains some legal jargon that the average reader cannot

---

execution of the Agreement and Release was not knowing and willful, counsel pointed only to facts and circumstances surrounding the claims that were settled by the release. See Transcript at 7:1-3; 9:13-25; 10:1-8; 23-25; 12:21-25; 13:1-13; 24:20-23; 37:23-2; 38:1-25; 39:1-12; 40:11-24; 41:9-16. Even when pressed, counsel did not or could not identify facts or circumstances that would raise a genuine dispute of material fact that Warren's execution of the Agreement and Release was not knowing and willful. See id.

parse or individually define. That alone does not invalidate a release." Romero, 1 F. Supp. 3d at 390.

The case law makes clear that more than length or use of legal terms is required for a release to be invalid under the OWBPA. Considering the case law, Warren's contentions, and having reviewed the Agreement and Release, the Court finds that the Agreement and Release is written in a manner calculated to be understood; and is therefore valid under the OWBPA.

**V. CONCLUSION**

Because, for the reasons set forth above, Warren's decision to enter into the Agreement and Release was knowing and willful, and the Agreement and Release is written in a manner calculated to be understood, the Court will grant Mastery's motion for summary judgment.

An appropriate order follows.